1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**
9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10
11  STACEY M. BROWN,                    No. CIV S-07-0638-CMK
12              Plaintiff,
13      vs.                             <u>MEMORANDUM OPINION AND ORDER</u>
14  COMMISSIONER OF SOCIAL
    SECURITY,
15              Defendant.
16  _____/

17          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

18  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

19  Pursuant to the consent of the parties, this case is before the undersigned for final decision on

20  plaintiff's motion for summary judgment (Doc. 17) and defendant's cross-motion for summary

21  judgment (Doc. 22).

22                      **I.  PROCEDURAL HISTORY**

23          Plaintiff applied for social security benefits twice, on May 14, 2002, and

24  December 23, 2003.  In her May 14, 2002 application, plaintiff claims that her disability began

25  on May 19, 2001.  Plaintiff claimed her disability consists of a combination of back/lower

26  extremity pain, and migraine headaches.  This claim was initially denied.  Following denial of

                                1

1  her request for reconsideration, plaintiff requested an administrative hearing, which was held on

2  April 16, 2003, before Administrative Law Judge ("ALJ") L. Kalei Fong.   ALJ Fong issued a

3  partially favorable decision on May 16, 2003, finding plaintiff was entitled to a closed period of

4  disability from May 19, 2001 and ceasing December 2, 2002.

5           In her December 23, 2003 application, plaintiff claims that her disability began on

6  January 1, 2003.  Plaintiff claimed her disability consists of a combination of  back/lower

7  extremity pain, migraine headaches and obesity.  This claim was also initially denied.  Following

8  the denial of her request for reconsideration, plaintiff requested an administrative hearing, which

9  was held on February 13, 2006, before ALJ Antonio Acevedo Torres.  In his June 14, 2006,

10 unfavorable decision, the ALJ made the following findings:

11     1.   The claimant met the disability insured status requirements of the Act on
12          January 1, 2003, the date the claimant stated she became unable to work,
            and continues to meet them through March 31, 2008.

13     2.   The claimant has not engaged in substantial gainful activity since
            January 1, 2003.
14
15     3.   The medical evidence establishes that the claimant has severe chronic low
            back pain and lower extremity pain status post L4-5 micro-diskectomy;
16          asthma; migraine headaches and obesity, but that she does not have an
            impairment or combination of impairments listed in, or medically equal to
17          one listed in Appendix 1, Subpart P, Regulations No. 4.

18     4.   The claimant's allegations regarding the degree of her pain and the
            resulting functional limitations are found to be not fully credible for the
19          reasons stated above.

20     5.   The claimant has the residual functional capacity as follows: the claimant
            continues to be able to lift 10 pounds occasionally and frequently; she is
21          limited to standing for two hours total; she is able to sit for up to 6 hours
            and all postural activities are limited to occasional.  There are no
22          nonexertional limitations (20 CFR §§404.1545 and 416.945).

23     6.   The claimant is able to perform her past relevant work as a customer
            service representative and a medical insurance biller as that job is regularly
24          performed.

25     7.   In the alternative, the claimant has the residual functional capacity to
            perform the full range of sedentary work (20 CFR §§404.1567 and
26          416.967).

8.  The claimant is 31 years old, which is defined as a younger individual (20 CFR §§404.1563 and 416.963).

9.  The claimant has a high school education (20 CFR §§404.1564 and 416.964).

10. In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

11. Section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rules 201.27 and 201.28 of Appendix 2, Subpart P, Regulations No. 4, direct a conclusion that, considering the claimant's residual functional capacity, age, education, and work experience, she is not disabled.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

The Appeals Council declined review on February 9, 2007.

## II.  SUMMARY OF THE EVIDENCE

### A.    MEDICAL RECORDS

The certified administrative record ("CAR") contains the following medical records:

1.  Records dated April 17, 2003, from Michael Levin, M.D. (CAR 364-65);

2.  Records covering the period from September 30, 2003, to January 26, 2004, from Urgent Care Center (CAR 366-73);

3.  Internal Medicine Consultative Examination, dated May 23, 2004, Karen Chee, M.D. (CAR 374-78);

4.  Progress notes covering the period from January 6, 2006, to August 19, 2004, Breanna Ruthrauff, M.D. (CAR 379-93);

5.  DDS Consultation Requests and Physical RFC dated June 18, 2004, to November 6, 2004 (CAR 394-403);

6.  Report dated February 10, 2005 from Breanna Ruthrauff, M.D. (CAR 404-05);

7.  Records covering the period from July 3, 2005 to December 6, 2006 from Primary Care Center (CAR 406-12);

/ / /

8.     Records covering the period from July 4, 2005, to November 20, 2005 from U.C. Davis Medical Center (CAR 413-23).

Treating Physician Reports

Plaintiff was seen by Dr. Ruthrauff for pain management, including managing her back pain.  The relevant records are summarized below.

2003

On January 6, 2003, Dr. Ruthrauff's progress report indicated plaintiff was seen for back and leg pain and migraines.  Plaintiff indicated to Dr. Ruthrauff that her pain was in the iliolumbar junction with aching in bilateral thighs and aching in the left posterior leg with some numbness in the sole of the foot.  Plaintiff complained of her left leg giving way once a week.  She rated her pain at an 8 to 10 on a 10-point scale, she was never pain free, and indicated it was worse with prolonged sitting and standing.  Her medications included Neurontin, Norco, Elavil and Duragesic.  Dr. Ruthrauff's exam showed a stable knee, some difficulty on squat to stand, no focal weakness in the left quadriceps, and no evidence for a motor radiculopathy or a myelopathy to cause the falls.  Plaintiff was to have an epidural steroid injection of lumbar spine.  She was to continue her Duragesic, and began methadone.

On February 5, 2003, Dr. Ruthrauff's progress report indicated plaintiff was seen again for back and leg pain and migraines.  Her medications included Neurontin, Darvocet-N, Elavil, MS-Contin, and Baclofen.  Plaintiff was allergic to the methadone, so she was transitioned to MS-Contin and Darvocet.  However, plaintiff reported she continued to have worsening pain and falling.  She rated her pain at a 7 to 9, again indicating she is never pain free.  Dr. Ruthrauff increased her Baclofen and MS-Contin, scheduled an EMG to rule out neuromuscular etiology of knee, and was waiting on the epidural steroid injection.

On February 6, 2003, plaintiff was seen by Stephen Knox, M.D. for electrophysiologic evaluation.  Dr. Knox's report indicates the nerve conduction studies of plaintiff's left lower limb were well within normal limits, the left and right H reflexes were

4

1   symmetrical and well within normal limits and the needle electromyography of multiple muscles

2   of both lower limbs showed very mild chronic partial denervation of the left more than the right

3   (note on both sides) of muscles subserved jointly by the L5 root.  There were no changes in the

4   acute partial innervation of the muscles sampled.  Dr. Knox's impression was "L5 radiculopathy

5   chronic at present with minimal symptoms.  The nature of her physical findings are out of

6   proportion to the electrodiagnostic abnormality especially the inability to walk on the heel and

7   suggests some other localized process to account for this problem." (CAR 389).

8            On March 11, 2003, Dr. Ruthrauff's progress report indicates plaintiff was seen

9   for back, leg and foot pain, and migraines.  Her medications included Neurontin, Darvocet-N,

10  Elavil, MS-Contin, Baclofen and Quinine Sulfate.  Dr. Ruthrauff indicated that the epidural

11  steroid injection was not helpful to plaintiff, and the EMG/nerve conduction study by Dr. Knox

12  showed some chronic denervation bilaterally at L5, but no evidence for arachnoiditis or

13  involvement of other nerve roots.  Plaintiff reported she feels better on MS-Contin and Baclofen,

14  but the Darvocet did not help much.  She stated she wanted to decrease some of her medications.

15  She rated her pain at a 7 to 9, and indicated she is never pain free.  She also indicated sitting is

16  worse than standing and bending forwards is worse than bending backwards.  Plaintiff reported

17  an increased frequency of headaches from once every two to three months to two to three in the

18  last month.  Dr. Ruthrauff decreased plaintiff's MS-Contin.  She also noted that if plaintiff's

19  headache frequency continued to increase, it could be a rebound headache phenomenon, which

20  would require tapering and discontinue abortive medications, including opiates.  Plaintiff was not

21  seen by Dr. Ruthrauff then for almost a year, until February 2, 2004 (see below).

22           Plaintiff was seen by Dr. Levin on April 17, 2003 for medial branch diagnostic

23  block.  Dr. Levin performed the block, but after 30 minutes in recovery, plaintiff stated there was

24  no change in her pain.  Plaintiff still experienced pain or pressure with forward flex which was

25  relieved upon extension of her spine.  This was the same as prior to the procedure.

26  / / /

1    Plaintiff was seen at Urgent Care Center on September 30, 2003 for a migraine.
2  She was given Demerol and Phenergan.

3    She was seen again at Urgent Care Center on December 19, 2003, complaining
4  about increased pain for at least three days.  She was told to apply heat and rest, and it appears
5  she was prescribed Hydrocodone.

6  <u>2004</u>

7    Plaintiff was seen at Urgent Care Center on January 26, 2004, after a fall.  She
8  was prescribed Soma, Vicodin and Phenergan.

9    On February 2, 2004, plaintiff was seen by Dr. Ruthrauff for back, leg and foot
10  pain, and migraines.  Her medications included Elavil and Neurontin.  Dr. Ruthrauff, noting it
11  had been a while since she had seen plaintiff, indicates she was still experiencing left leg
12  giveway and accompanying falls.  Dr. Ruthrauff states plaintiff "has not been able to return to
13  work, though she was able to work out in the gym fairly religiously for one hour per day."  (CAR
14  383).  Plaintiff described lumbar and buttock deep aching pain into anterior thighs and then the
15  posterior left calf.  She rated her pain at 9 out of 10.  After a fall, plaintiff was given Vicodin and
16  Soma, which helped somewhat.  She complained of interval onsets of pain in her wrists and
17  elbows and deltoids, describing it as a deep ache constant and worsens with computer activities.
18  Dr. Ruthrauff found rare swelling in the joint, but no frank inflammatory arthritic changes.
19  Plaintiff again indicated she is never pain free.  Dr. Ruthrauff noted plaintiff was in no acute
20  distress and sat fairly comfortably thought the exam.  Plaintiff had a normal heel, toe, tandem,
21  and squat to stand, except for decreased left heel walk.  She was tender to palpation throughout
22  the whole back.  Twenty degrees forward flexion caused left lower extremity radicular pain,
23  extension to 10 degrees.  There was normal sensation, except for the left foot and arch.  She did
24  have positive straight leg raises.  Plaintiff also described a slight decrease in sensation into the
25  left forearm in a stocking distribution, not including the face or shoulder, and no hemisensory
26  decrements.  Trace Hoffmans was present, but the remainder of the level four exam was normal.

6

Dr. Ruthrauff prescribed Vicodin, and discussed chronic Vicodin use with plaintiff.

On June 21, 2004, Dr. Ruthrauff's progress report indicates plaintiff was seen again for back, leg and foot pain, and migraines. Her medications included Vicodin and Elavil. Dr. Ruthrauff prescribed Tylenol with codeine for plaintiff to try rather than Vicodin, and magnesium oxide. She also suggested plaintiff try meditation for the chronic pain.

On August 19, 2004, Dr. Ruthrauff's progress report indicates plaintiff was seen for back and leg pain. Her medications included Vicodin, Tylenol with codeine, and Elavil. Plaintiff reported her pain was at a level of 4 to 5, but that the pain was worse and noted overall entire body muscles aches. Her low back pain was aching and stabbing into her left foot. Dr. Ruthrauff noted plaintiff "has been most active and gained a little bit of weight. Back and leg pain is constant . . . ." (CAR 379). Dr. Ruthrauff also noted plaintiff was suffering from insomnia. Plaintiff reported the Tylenol with codeine was not helpful, so it was discontinued. The Vicodin was continued, and the Elavil was increased.

2005

On February 10, 2005, Dr. Ruthrauff's progress report indicates plaintiff was seen for back and leg pain. Her medications included Vicodin and Elavil. Plaintiff reported her pain was at an 8 of 10, was worse and constant. The pain was increasing with intensity the last two to three months. Dr. Ruthrauff noted plaintiff's increased Elavil was causing twitching and interfering with her thought process. Her dosage was reduced. Plaintiff reported that she takes her medications as prescribed with improved function and she is less active. Dr. Ruthrauff noted plaintiff had chronic intractable pain syndrome, polypharmacy with complex multiple diagnoses, which make plaintiff a complex patient. Her Vicodin was refilled, as was her Elavil.

On July 4, 2005, plaintiff was seen at U.C. Davis for increased back pain, stating she had her usual pain radiating to her left buttocks and down her left leg. She had been taking Vicodin without relief. She was given Dilaudid and Phenergan, with good relief, then prescribed Valium and Vicodin and advised to follow up with her primary care physician.

7

1        Plaintiff was then seen on July 8, 2005, at the Primary Care Clinic for follow up to

2    her emergency room visit.  She reported her pain level was an 8 to 9 out of 10, with pain

3    radiating down legs.  She was seen again on August 25, 2005, for chronic low back pain.  She

4    was again prescribed Vicodin for her pain, noting that she cannot afford Norco.

5        She was then seen at U.C. Davis on November 20, 2005, for exacerbation of low

6    back pain radiating down the extremity.  She had an X-ray of the LS spine which was within

7    normal limits.  She was given an injection of morphine sulfate, which gave her some relief.  It

8    was recommended she resume her activities as tolerated, particularly walking, but to avoid

9    lifting, pushing, and pulling.  She was given a prescription for Norco, and told to follow up with

10   her primary care physician.

11       Plaintiff was then seen on December 1, 2005, at the Primary Care Clinic for her

12   chronic low back pain, which got worse over a week prior.  She was also seen for her asthma,

13   and possible carpal tunnel syndrome.  She was seen again on December 3, 2005, indicating

14   increase in pain for three days, medication not helping, and having muscle spasms.  She was seen

15   at the Primary Care Clinic again on December 12, 2005 for her pain.

16      Examining Physician Reports

17       On May 23, 2004, plaintiff was seen by Dr. Chee for a comprehensive internal

18   medicine evaluation.  During the examination, plaintiff reported she was in constant pain, has

19   chronic left foot numbness with increasing right foot numbness, periodic falls, and that her pain

20   persists despite her medication.  As to her daily activities, Dr. Chee reports plaintiff stated she

21       is able to get up in the morning and take care of her cats which
     include obtaining their food and changing their litter.  She currently

22       lives with her grandparents and is able to fix her own meals, dress
     herself and shower for herself.  The rest of the day is spent

23       watching television most of the day and occasionally working on
     the computer and checking her e-mail.  She is able to perform

24       occasional crafts at home including painting birdhouses and
     working on scrapbooks.  She finds that her primary activities are

25       largely limited now as she cannot keep up with friends secondary
     to her decreased fatigue and pain.  She finds she cannot ambulate

26   / / /

1    stairs well and at most just walking before her back pain becomes
     much more marked."
2    (CAR 374).

3           Dr. Chee noted plaintiff's history of asthma, migraines, low back pain, and right

4    knee surgery.  On physical examination, Dr. Chee reports plaintiff is 60" and 228 pounds, was in

5    no acute distress and was able to ambulate on and off the exam table without difficulty.

6    Plaintiff's coordination/station/gait exam was normal; she had negative Romberg and normal

7    finger-to-nose and heel-to-shin.  She did not have an assistive device.  Her range of motion was

8    as follows:

9           Cervical Region: Lateral flexion 0-45 degrees, flexion 0-50
            degrees, extension 0-60 degrees, and rotation 0-80 degrees.
10          Lumbar Region: Decreased flexion 0-20 degrees, extension 0-10
            degrees, and lateral flexion 0-20 bilaterally.
11          Hip Joints: Forward flexion 0-100 degrees, backward extension 0-
            30 degrees, rotation-interior 0-20 degrees, rotation-exterior 0-30
12          degrees, abduction 0-25 degrees, adduction 0-15 degrees
            bilaterally.
13          Knee Joints: Extension zero degrees, flexion 130 degrees
            bilaterally.
14          Ankle Joints:  Dorsiflexion 0-20 degrees and plantar flexion 0-40
            degrees bilaterally.
15          Shoulder Joints: Forward flexion 0-180 degrees, extension 0-50
            degrees, abduction 0-180 degrees, adduction 0-50 degrees, internal
16          rotation 0-90 degrees, external rotation 0-90 degrees bilaterally.
            Elbow Joints: Flexion-extension 0-140 degrees, supination 0-80
17          degrees, and pronation 0-80 degrees bilaterally.
            Writs Joints: Extension 0-60 degrees, flexion 0-60 degrees, radial
18          deviation 0-20 degrees, ulnar deviation 0-30 degrees bilaterally.
            Finger/Thumbs: Flexion/extension of the proximal phalanx 70
19          degrees and distal phalanx 90 degrees bilaterally.

20   (CAR 376-77).

21          Plaintiff's straight leg raising was positive on the left with radiating pain on

22   elevation of her leg.  On the muscular exam, Dr. Chee noted some tenderness to palpation in the

23   L2 and L5 region, but no paraspinal tenderness.  Plaintiff's had 4+/5 strength in the left lower

24   extremity, hips and knee extension.  She had a decreased sensation to L4, L3 and S1 distribution

25   on the left lower extremity to touch, vibration and cold.  Her cranial nerves II-XII were intact as

26   were her deep tendon reflexes.

Dr. Chee's diagnoses included:  L3-L5 radiculopathy, obesity, asthma.  Her functional assessment was that plaintiff:

> can be expected to stand and walk about 2-6 hours at a time largely limited secondary to decreasing strength in the left lower extremity and decrease in sensory function period.  There were no obvious limitations with regards to sitting for unrestricted periods of time.  With regards to lift and carry, [plaintiff] can be expected to lift about 20 pounds frequently which again would be largely limited by decrease in flexion in her back and her obesity.  She has no need of any assistive device at this time.  With regards to postural limitations on bending and stooping, the claimant can be expected to do this occasionally which would be largely limited by her decrease in rang of motion on lumbar exam.  There are no obvious manipulative limitations on exam.  There are no other relevant restrictions with regards to workplace communication and visual.

(CAR 378).

On June 21, 2004, a consultation examination residual capacity assessment indicated plaintiff was capable of lifting 20 pounds occasionally, 10 pounds frequently, standing and/or walking at least two hours in an eight-hour workday, sitting about six hours, had the unlimited ability to push and/or pull, other than the limitation on her ability to lift.  All postural limitations were at occasional, and she had no other limitations.  This opinion was reviewed on November 8, 2004, and was affirmed, noting plaintiff's constant pain, and that she is maintained on a large amount of Vicodin.

## B.    HEARING TESTIMONY

On February 13, 2006, the ALJ held a hearing, at which plaintiff testified as to her daily activities and pain.  Plaintiff was represented at the hearing by Danielle Duarte, a non-attorney representative.   On direct examination, plaintiff testified that she is a high school graduate with vocational training.  Her previous employment history included medical billing, health desk rep (processed pharmacy claims), and cashier.  She stopped working in May 2001 due to a back injury.  In 2001, 2002 and 2003, she saw a doctor about once a month.  In 2004, she lost her insurance, so was unable to see a doctor as often.  In 2004 and 2005, she estimated she was a doctor maybe once every two months.  She was taking a total of 11 different

1   medications for migraines and back injury.  She testified she is never completely relieved of pain,

2   the medication just takes the edge off.  She states she does not sleep the whole night, and only

3   gets about two hours of sleep total, each stretch about a half an hour.  She will sometimes take

4   naps during the day.  She only drives maybe 10 miles a month, and her dad drove her to the

5   hearing.  She lives with her grandparents who are 82 and 85.

6            She testified she can walk about a half a block, stand for 15 to 20 minutes, and sit

7   for 15 to 20 minutes.  She can lift a half gallon of milk.  She eats at a restaurant maybe once

8   every two weeks.  From six a.m. to 12 noon, she usually gets up, gets dressed, feeds her cats,

9   cleans the litter box and rests.  She maybe watches a few minutes of television, here and there.

10  She will occasionally ready a book or magazine.  She does the dishes and laundry, but not a lot of

11  housework, which she shares with her grandparents.  As for cooking, she usually microwaves

12  frozen dinners.  She stated sometimes she can do housekeeping, but some days she cannot.  She

13  will sometimes go grocery shopping.  In the afternoons, she again takes care of her cats, will use

14  the computer for three to four hours, a little at a time.  She will do some crafts, like

15  scrapbooking, and will watch TV off and on.

16           Under examination by her representative, plaintiff testified that her back pain and

17  migraines keep her from working.  She also has a knee injury and a fused vertebrae in her neck

18  which she was born with and has not had surgery on.  Her pain is in her low back, and it goes

19  into her leg and foot.  It is there all the time.  She will have some good days, maybe once a week,

20  and bad days more often, probably three or four days a week.  Her pain is about a nine on a 10

21  point scale.  She does not do much, watches TV, lays down, whatever she can do so she doesn't

22  hurt.  She takes pain pills "all the time."  The medication makes her a little tired, and she cannot

23  think very well, she gets confused or forgets what she is doing.  It sometimes makes her fall

24  asleep.  She has problems concentrating.  She has pain, numbness, weakness in her left leg, and

25  starting in her right.  Her leg will give out and she will fall about once a week.  She sometimes

26  uses a cane, which was prescribed by "the neurosurgeon."  She tries not to use the cane very

1   often, only when she absolutely needs it, maybe two to three times a month.  She does not have a

2   leg brace or anything.

3          She has pain in her knee, which gives out, and she cannot sit or stand very long

4   without it hurting worse.  It can give out a couple times a day, but she is getting good at catching

5   herself to avoid falling.  She then needs to rest for a little while, maybe a half hour.  There is no

6   additional pain in her knee when it gives out.  She gets migraine headaches, about two to three a

7   month which last for two to three days.  She experiences nausea, vomiting, light and sound

8   sensitivity.  She takes medication for the migraines which sometimes helps.  She will sometimes

9   have to go in and have a shot for the migraine.  The last time she did was about six months

10  previous.  She does not get much warning before she gets a migraine.

11         Plaintiff's last asthma attack was about two weeks prior to the hearing.  When she

12  has an attack, it is hard for plaintiff to breath, she wheezes.  She just uses inhalers, which help

13  pretty well most of the time.  A few months prior to the hearing, she went to urgent care for her

14  asthma, and received a Nebulizer for the first time.  Her asthma will flare up if she is really active

15  or from the weather.  Really active to her is "[m]aybe doing some laundry, carrying it.  Nothing, .

16  . . not running or anything." (CAR 448).  She uses her inhalers every day.

17         She testified she has carpal tunnel in both writs.  She has not had surgery, and her

18  doctor has not talked to her about doing surgery.  She does wear braces off an on pretty much

19  every day.  She wears them for a while, until they become annoying and hurt her, then she will

20  take them off for a while.  She drops things.  Her right hand is worse, and she is right handed.

21  She does not like driving on pain medication and it hurts to drive.  It hurts to ride in cars, so she

22  does not get in a car unless she has to go somewhere.  Her car is an automatic.  On a bad day, it

23  takes a long time to get in and out of a car, and it hurts.  It is hard to twist to look behind her.

24  Her hands will go numb holding the steering wheel.  She drives maybe two times a month, if she

25  needs something at the grocery store, or has to take her parents or grandparents to the doctor.

26  Her dad usually drives her to her doctor, which is about 15 miles away.

12

1    She will do laundry, but has problems carrying it, reaching the bottom of the

2  washer, and pulling it in and out of the dryer.  In doing the dishes, she drops them, and it is hard

3  to stand up to do them.  She will usually "wash a few, kind of sit down for a little bit and go back

4  and forth." (CAR 452).  She needs to take a break for about 10 to 15 minutes, before she can

5  return to do more dishes.  She will vacuum once in a while.  The last time was maybe a month

6  prior to the hearing.  She has to "stop and start, go back and forth a lot" while completing chores.

7  (CAR 452).  She does not attend church or social groups.  She visits with friends maybe once a

8  month, and they usually come over to see her.

9    She will scrapbook maybe a couple of times a week.  She cannot sit for very long,

10  and has to get up and down and has a hard time grabbing little pieces with her hands.  She can sit

11  and do an activity for about 15 or 20 minutes.  It is hard for her to put on her shoes.  On a good

12  day she can bend over and put her shoes on, but it is painful.  On bad days she will usually wear

13  slip on shoes.  Her shower is "geared for handicap people" with a bench and handle, which she

14  uses to shower.  (CAR 453).

15  ### III.  STANDARD OF REVIEW

16    The court reviews the Commissioner's final decision to determine whether it is:

17  (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

18  whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

19  more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

20  (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

21  support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

22  including both the evidence that supports and detracts from the Commissioner's conclusion, must

23  be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

24  v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

25  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

26  Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

1  findings, or if there is conflicting evidence supporting a particular finding, the finding of the

2  Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

3  Therefore, where the evidence is susceptible to more than one rational interpretation, one of

4  which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

5  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

6  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

7  Cir. 1988).

8                                            **IV.  DISCUSSION**

9                  In her motion for summary judgment, plaintiff argues that the ALJ erred in two

10 ways in determining that she was not disabled.  Specifically, plaintiff argues: (1) the ALJ failed

11 to credit her testimony regarding her pain and functional limitations without providing clear and

12 convincing reasons for so doing; and (2) the ALJ failed to properly assess her residual functional

13 capacity ("RFC") and found her capable of her past work, or, in the alternative, not disabled

14 based on the GRIDS without the expertise of a Vocational Expert.

15                 **A.     CREDIBILITY**

16                  Plaintiff argues that the ALJ failed to credit her testimony regarding her pain and

17 functional limitations.

18                  The Commissioner determines whether a disability applicant is credible, and the

19 court defers to the Commissioner's discretion if the Commissioner used the proper process and

20 provided proper reasons.  See Saelee, 94 F.3d at 522.  An explicit credibility finding must be

21 supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir.

22 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).

23 Rather, the Commissioner must identify what testimony is not credible and what evidence

24 undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record

25 of malingering, the Commissioner's reasons for rejecting testimony as not credible must be

26 "clear and convincing."  See id.

                                                     14

1          If there is objective medical evidence of an underlying impairment, the

2 Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3 because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4 341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

5 the symptoms alleged, including aggravating factors, medication, treatment, and functional

6 restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1)

7 the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

8 testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

9 prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

10 physician and third-party testimony about the nature, severity, and effect of symptoms.  See

11 Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

12          Here, the ALJ states:

13     Clearly, if [he] were to find the testimony of the claimant to be
    credible, a finding of disability would be directed.  However, the
14     claimant's subjective complaints, standing alone, do not provide a
    basis to find "disability," and the [ALJ] finds that the objective
15     medical evidence, including records from the claimant's treating
    physician, do not support the degree of fatigue, pain, side effects
16     from medications, and other limitations as alleged by the claimant.

17     Although the claimant's impairments could reasonably be expected
    to produce some limitations, the claimant's testimony and
18     statements of record suggest greater limitations [than] can be
    shown by the objective medical evidence.
19
    While the [ALJ] finds credible the claimant's report that she
20     continues to experience back pain and lower extremity pain status
    post surgery, the [ALJ] does not find credible the reports that
21     [these] symptoms occur when the claimant limits herself to
    sedentary type activity.  Rather, given the claimant's daily activity
22     and the medical findings of record, the [ALJ] finds that [the]
    claimant remains capable of performing a full range of sedentary
23     work.  Specifically, the [ALJ] agrees with the Disability
    Determination Service physician and finds that the claimant
24     continues to be able to lift 10 pounds occasionally and frequently.
    She is limited to standing for two hours total.  She is able to sit for
25     up to 6 hours and all postural activities are limited to occasionally

26 ///

1
2
3
4
5

In making this determination, the [ALJ] notes there is no opinion evidence from the claimant's treating physician in support of the claimant's allegation that her pain is of a degree which would preclude her from performing all work.  While treating records document that the claimant has sought treatment for pain, it appears that when the claimant takes her pain medications, her pain is sufficiently controlled when the claimant restricts herself to sedentary activities.  A review of the treating record shows that the claimant has reported increased pain when she performs exertional activities in excess of sedentary work.

6
7
8
9
10

Additionally, the [ALJ] notes that the consultative physician who examined the claimant indicated that the claimant would be able to perform even light work despite the medical findings supporting evidence of continuing residuals from her back disorder as well as considering the claimant's obesity and migraine headaches.  Thus, the [ALJ] is giving the claimant the benefit of the doubt as the consultative physician, an examining physician, has opined that the claimant is able to perform light work.

11
12
13
14
15

The undersigned also did not find credible the claimant's report of an inability to perform all work given her reported daily activities.  At the hearing and when seen by the consultative physician, the claimant reported she is able to perform personal care needs independently.  She is able to cook, perform shopping and other household chores as needed.  She also participates in recreational activities consistent with sedentary work including painting bird houses, working on the computer and scrapbooking.  The above activities are inconsistent with her report of an inability to perform sedentary work.

16
17
18

In regards to the claimant's allegation that she requires a cane occasionally, the records do not show she has ever been prescribed a cane.  Similarly, she has been treated for injuries following a fall only once or twice and her asthma appears to be under good control with medications.

19
20
21
22

There is no support for claimant's allegation of bilateral carpal tunnel syndrome.  Similarly, she has not sought treatment on a frequent basis for migraines.  Thus, considering all of the claimant's impairments, the [ALJ] finds the claimant remains capable of performing sedentary work as stated above.

23
(CAR 18-19).

24
The ALJ found plaintiff's testimony not entirely credible because, in addition to

25
the medical records not supporting the degree of pain and limitations she claims, the record

26
indicates that when she limits her activity level to sedentary and takes her medication, her pain is

1    controlled sufficiently to allow her to perform sedentary work.  In addition, the ALJ found her

2    daily activities were inconsistent with her alleged limitations, and her credibility was questioned

3    due to her testifying to limitations that there was no support for, specifically the need for a cane

4    and carpal tunnel.

5           The court finds that these reasons are clear and convincing.  The ALJ can consider

6    the plaintiff's daily activities, truthfulness and prior inconsistent statements when evaluating a

7    plaintiff's credibility.  As the ALJ stated, plaintiff testified that she is able to participate in a

8    number of sedentary activities, including computer work, scrapbooking, and painting bird

9    houses.  She testified that she required breaks while doing so, but this is not inconsistent with the

10   ability to perform sedentary work with frequent breaks.  The ALJ found plaintiff was capable of

11   performing some household chores, and some shopping.  In addition, in reviewing the treating

12   physician's notes, it appears that plaintiff "was able to work out in the gym fairly religiously for

13   one hour per day."  (CAR 383).  As to plaintiff's truthfulness and/or prior inconsistent

14   statements, the court notes the ALJ's evaluation of plaintiff's need for a cane, indicating there is

15   no support for her testimony.  In fact, the court notes that Dr. Chee, an examining physician,

16   specifically states that plaintiff does not need any assistive devices.  The court finds only one

17   notation in her medical records to support her claim of carpal tunnel.  However, there is no

18   record of plaintiff having received any on going treatment for carpal tunnel.

19          The court finds the ALJ's rejection of plaintiff's testimony, to the extent of her

20   pain and limitations, was supported by clear and convincing reasons.

21          **B.      RESIDUAL FUNCTIONAL CAPACITY**

22          Plaintiff argues that the ALJ failed to take into account her pain and functional

23   limitations in determining her residual functional capacity.  Specifically, she alleges the ALJ

24   failed to take into consideration her inability to sit for more than 15 to 20 minutes, her required

25   one-hour naps, and her migraine headaches which occur two to three time per month and last two

26   to three days.

1        Residual functional capacity is what a person "can still do despite [the

2   individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

3   Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

4   "physical and mental capabilities"). Thus, residual functional capacity describes a person's

5   exertional capabilities in light of his or her limitations.[1]

6        Plaintiff's argument here is intertwined with her previous argument regarding her

7   credibility and testimony. However, as discussed above, the court cannot substitute its judgment

8   for that of the ALJ when the evidence can support either outcome. See Tackett v. Apfel, 180

9   F.3d 1094, 1098 (9th Cir. 1999). The court found the ALJ properly considered plaintiff's

10  testimony and found it not entirely credible. The ALJ did not err in his findings, and there is no

11  reason for the court to find it unsupported. Accordingly, the ALJ's finding that plaintiff has the

12  RFC to perform, and is capable of performing, her past relevant work is likewise supported by

13  substantial evidence.

14       Plaintiff also argues that the ALJ erred in utilizing the Medical-Vocational

15  Guidelines ("Grids") instead of procuring a vocation expert's testimony regarding her

16  limitations. However, this argument is again related to the ALJ's finding of plaintiff's

17  limitations. Plaintiff argues that she has severe non-exertional impairments, including pain, and

18  an inability to sit for more than 15 to 20 minutes. But the ALJ found this not entirely credible,

19  _____

20       [1]   Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work. See 20 C.F.R., Part 404, Subpart

21  P, Appendix 2, § 200.00(a). "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. See 20

22  C.F.R. §§ 404.1567(a) and 416.967(a). "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. See 20 C.F.R. §§

23  404.1567(b) and 416.967(b). "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. See 20 C.F.R. §§

24  404.1567(c) and 416.967(c). "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. See 20 C.F.R. §§

25  404.1567(d) and 416.967(d). "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.

26  See 20 C.F.R. §§ 404.1567(e) and 416.967(e).

1  and found plaintiff capable of sitting for up to six hours.  The ALJ specifically found she has no

2  nonexertional limitations.

3           To achieve uniformity of decisions, the Commissioner has promulgated

4  regulations which contain, inter alia, a five-step sequential disability evaluation to determine

5  whether a claimant is physically or mentally disabled.  See 20 C.F.R. §§ 404.1520 (a)-(f),

6  416.920(a)-(f).   If during any point of this review, it is determined that the claimant is not

7  disabled, the claim is not to be considered further.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).

8  The Commissioner first determines whether the claimant is engaged in substantial gainful

9  activity.  If the claimant is not engaged in substantial gainful activity, it is next determined

10  whether she has a severe impairment.  If she has a severe impairment, but her impairment is not

11  severe enough to meet or equal any of the impairments listed in the regulations, it must be

12  determined whether the impairment prevents her from performing her past work.  If the

13  impairment does not, the claimant is presumed not disabled and the analysis ends.  Only if it is

14  determined that she is incapable of performing her past relevant work, does the Commissioner

15  determine whether she can engaged in other types of substantial gainful work that exists in the

16  national economy.  See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989).

17           Here, the ALJ found plaintiff capable of performing her past relevant work.  This

18  determination is a finding that plaintiff is not disabled, and her claim did not need to be

19  considered further.  However, the ALJ took her claim one step further and found that in addition

20  to her past relevant work, she was capable of performing a full range of sedentary work.

21           The Grids provide a uniform conclusion about disability for various combinations

22  of age, education, previous work experience, and residual functional capacity.  The Grids allow

23  the Commissioner to streamline the administrative process and encourage uniform treatment of

24  claims based on the number of jobs in the national economy for any given category of residual

25  functioning capacity.  See Heckler v. Campbell, 461 U.S. 458, 460-62 (1983) (discussing

26  creation and purpose of the Grids).

1    The Commissioner may apply the Grids in lieu of taking the testimony of a

2 vocational expert only when the grids accurately and completely describe the claimant's abilities

3 and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler, 461

4 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the Grids if a

5 claimant suffers from non-exertional limitations because the Grids are based on strength factors

6 only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).  "If a claimant has an

7 impairment that limits his or her ability to work without directly affecting his or her strength, the

8 claimant is said to have non-exertional . . . limitations that are not covered by the Grids."  Penny

9 v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404, Subpart P, Appendix 2, §

10 200.00(d), (e)).  The Commissioner may, however, rely on the Grids even when a claimant has

11 combined exertional and non-exertional limitations, if non-exertional limitations do not impact

12 the claimant's exertional capabilities.[2]  See Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir.

13 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

14    Here, reliance on the Grids was sufficient.  The ALJ found plaintiff had the RFC

15 to lift 10 pounds, stand for two hours total, sit for up to six hours,  limit her postural activities to

16 occasional, and had no non-exertional limitations.  In addition to finding plaintiff capable of her

17 past relevant work, this RFC gave her the capacity to perform the full range of sedentary work.

18 This determination is supported by substantial evidence.  Plaintiff has provided no evidence,

19 beyond her testimony of pain, to show any non-exertional limitations which would limit her

20 ability to perform sedentary work.  The court finds no error in the ALJ's determination that

21 plaintiff is capable of her past relevant work, or the determination that plaintiff is capable of

22 performing the full range of sedentary work.

23    ───────────────

24    [2]    Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart

25 P, Appendix 2, § 200.00(a).  Non-exertional activities include mental, sensory, postural, manipulative, and environmental matters which do not directly affect the primary strength

26 activities.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.    Plaintiff's motion for summary judgment is denied;

2.    Defendant's cross-motion for summary judgment is granted; and

3.    The Clerk of the Court is directed to enter judgment and close this file.

DATED:  August 19, 2008

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE